## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **MARK E. WOOLLEY** | : | CIVIL ACTION NO. |
| Plaintiff, | : | |
| v. | : | JURY TRIAL DEMANDED |
| **MICHAEL GROFT** | : | |
| | : | **AMENDED COMPLAINT** |
| Defendant. | : | |

## AMENDED COMPLAINT

## INTRODUCTION

This case arises from a years' long fraudulent scheme carried out by defendant Michael Groft ("Groft") at the expense of his business partner and colleague plaintiff Mark Woolley ("Woolley"). Years ago, as one of two shareholders of MGM Enterprises, Inc. ("MGM"), a real estate investment company, Woolley brought Groft on as Chief Financial Officer, and within less than a month, Woolley promoted Groft to President. Knowing Groft's professional background in banking and knowing him personally, Woolley had MGM hire Groft in an executive role to be a pivotal part of MGM's management and leadership. As a complement to the employment agreement, MGM and Groft also agreed to a certain arrangement by

which Groft would obtain proceeds from future real estate investment without having to pay upfront.

Specifically, the agreed-upon arrangement was as follows: Woolley allowed Groft to defer payment of his interest until Groft received funds through subsequent refinancing projects or sale of the subject property. When refinancing or sale proceeds came in, the value of Groft's interest would first be paid to Woolley. Only after Woolley received proceeds from Groft's share in the property that equaled the purchase price for that share would Groft be eligible to receive further proceeds. Thus, Groft received a small interest in each property without paying anything upfront. The arrangement was reflected in individual limited partnership agreements and demand notes executed for each individual property acquired by MGM.

Taking advantage of his position as President and his relationship with Woolley, Groft disregarded his obligations under the notes and improperly began collecting refinance proceeds from the investments before his obligations under the agreements were satisfied. Worse yet, when Groft was directly confronted about the status of the amounts owed to Woolley, Groft made numerous false representations as to the status and went so far as to provide financial documents intentionally misrepresenting the statuses.

Groft has never paid for his interests in these fourteen properties. Additionally, he has improperly retained proceeds from the refinancing of these

properties.  Woolley demanded payment from Groft but his efforts have been to no avail.  Accordingly, for the reasons set forth below, Groft's conduct constitutes a breach of contract, fraud, and unjust enrichment, and Woolley avers as follows:

## PARTIES

1.      Plaintiff, Mr. Mark E. Woolley ("Woolley"), is a resident and citizen of Florida.

2.      Defendant, Mr. Michael Groft ("Groft"), is a resident and citizen of Pennsylvania.

## JURISDICTION AND VENUE

3.      The jurisdiction of this Court is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.  The matter in controversy, exclusive of interests and costs, exceeds the sum of Seventy-Five Thousand ($75,000) Dollars.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## FACTS

I.      **The Parties Form a Business Relationship, and Groft Becomes President of MGM Enterprises, Inc.**

5.      Woolley, as Secretary of MGM Enterprises, Inc. ("MGM"), is an experienced businessman and real estate investor.  Woolley, through MGM, invests in and manages numerous real estate properties, largely residential properties, in Central Pennsylvania.

LEGAL\51165442\1

6.     Woolley is one of two shareholders of MGM. Steven J. Gumenick ("Gumenick") is the other shareholder of MGM.

7.     In early 2008, Woolley and MGM decided to hire Groft as its Chief Financial Officer.  Before Groft joined the MGM team, he had significant professional experience in banking.  Groft and Woolley also had known each other personally for years.  Given Woolley's appreciation of, and respect for, Groft as a businessman, he believed Groft was trustworthy and would be a valuable addition to MGM.

8.     On or about February 19, 2008, Groft and MGM executed an employment agreement (the "Employment Agreement") which set forth Groft's responsibilities and obligations as MGM's CFO.  (*A true and correct copy of the Employment Agreement is attached hereto as Exhibit 1*).  The Employment Agreement provided that as "Chief Financial Officer of the Company," Groft would "be responsible for its entire operation."  (*Id.* at § 2.)

9.     Groft was to receive an annual salary of one hundred thirty-five thousand dollars ($135,000) in addition to other benefits from MGM, including  a luxury car and a $15,000 payment to the County Club of York to cover the balance of Groft's membership dues.  Groft's compensation, both his salary and other benefits, was a significant increase over his prior employment.

10.     Within a couple of weeks of executing the Employment Agreement, MGM promoted Groft to President.  He was also provided a seat on MGM's Board of Directors.

11.     Another critical component of Groft's employment and compensation arrangement with MGM was that he could receive an interest in yet-to-be-acquired properties without having to make any upfront payment.

12.     The Employment Agreement specifically provided that should MGM or its shareholders acquire additional real estate in the future, any such real estate would be purchased by a limited partnership.  (*Id.* at §7.)  Specifically, it provided as follows:

> **Future Acquisitions:**  In the future, should [MGM] and/or Shareholders Woolley and Gumenick elect to acquire additional real estate, they shall form a limited partnership for that purpose.  Each such limited partnership shall have a one (1%) percent general interest and a ninety-nine (99%) percent limited partnership interest.  [Groft] shall receive five (5%) of the ninety-nine (99%) percent limited partnership interest.  The balance of the limited partnership interest shall be owned equally between Shareholders Woolley and Gumenick.

13.     The intent of this arrangement – to allow Groft an opportunity to participate in real estate ventures through loans from Woolley and Gumenick, which would then be repaid through subsequent sales or refinances of the properties – was understood between the parties.

14. Groft, as stated in the Employment Agreement, would receive an interest in future acquisitions without having to provide capital at the time of purchase. Rather, for each future acquisition, Woolley and/or Gumenick would pay Groft's share of the purchase price, and separate agreements, including limited partnership agreements, would be executed setting forth Groft's obligation to repay Woolley (or Gumenick) for the interest.

15. The intent, which was expressly provided for in future agreements, was that Groft would be able to repay the Demand Notes using proceeds obtained when the property would be refinanced, assuming the property appreciated in value.

16. In effect, Woolley permitted Groft to defer payment of his interest in a property until Groft received purchase price funds through a refinance or sale of the property. This arrangement also eliminated substantial downside risk for Groft – he put nothing down upfront, and Woolley instead assumed the investment risk that the property would appreciate.

17. Once Groft repaid his interest through refinancing proceeds, he would be eligible to retain future funds.

18. This structure was favorable to all parties. Assuming the group made smart real estate investment decisions, there would be an increase in property value, benefitting all partners of the limited partnership; Groft would receive a five

(5%) percent partnership share without making any initial payment; and the shareholder as general partners, would maintain control over the investment.

## II. Groft Received a 5% Interest in Several Properties from Woolley in Exchange for Demand Notes and Promises to Repay the Purchase Price

19.     With this purpose in mind, between 2008 and 2013, Woolley (and sometimes Gumenick) provided Groft with ownership interests in fourteen (14) limited partnerships.  Each ownership interest was subject to a note ("Demand Note") which was executed to account for Groft's upfront ownership in the property.

20.     For each of the fourteen properties, Groft executed a Demand Note which prominently and explicitly, in the first paragraph, stated that Groft "promises to pay" Woolley the purchase price on demand, and which reflected that Groft had received an interest without making any initial payment and was obligated to repay his share in the subject property to MGM's shareholders prior to receiving any income from the refinance or sale of the property.  (*A true and correct copy of the fourteen Demand Notes is attached as Exhibit 2*).

21.     Each Demand Note and its value is summarized below:

| Property | Date | Total Loan Amount | Loan Amount to Woolley |
|---|---|---|---|
| Legends II Apartments | March 28, 2008 | $136,550.00 | $68,275.00 |
| Cold Springs Apartments | March 28, 2008 | $157,495.00 | $78,747,50 |

| | | | |
|---|---|---|---|
| Colonial Glen Apartments | March 28, 2008 | $52,937.00 | $26,468.50 |
| Cool Creek Manor Apartments | March 28, 2008 | $387,500.00 | $193,750.00 |
| Beaufort Park Apartments | July 9, 2009 | $237,158.00 | $237,158.00 |
| Hampton Court Apartments | July 9, 2009 | $219,041.00 | $219,041.00 |
| Spring Meadow Apartments | July 9, 2009 | $142,683.00 | $142,683.00 |
| Brandywine II Apartments | July 9, 2009 | $147,609.00 | $147,609.00 |
| Brandywine I Apartments | July 9, 2009 | $108,169.00 | $108,169.00 |
| Heathwood Village | July 9, 2009 | $273,731.00 | $273,731.00 |
| Paxton Park Apartments | July 9, 2009 | $107,093.00 | $107,093.00 |
| Hunters Glen | July 9, 2009 | $74,850.00 | $74,850.00 |
| Westgate Terrace | July 9, 2009 | $231,756.00 | $231,756.00 |
| KGLA Associates | March 13, 2013 | $262,200.00 | $262,200.00 |

22.     Each Demand Note reflects the Parties' intention that when a property would be refinanced in the future, Groft would not receive any proceeds from the refinancing.  Rather his share would first be paid to the MGM shareholder(s) on the respective Demand Note.  Groft was only entitled to begin collecting refinancing proceeds once he repaid the shareholder(s) for the cost of the five percent (5%) interest the was provided to him.

23.     Under this agreement, Groft began to collect from the cash flow of each property from the outset, but he would not receive proceeds from any future

refinancing until the refinance proceeds were first paid to Woolley (and sometimes Gumenick) in an amount sufficient to cover the amount of the respective Demand Note.

24.     The language included in each Demand Note was as follows:

> "Any proceeds from refinancing or the sale of the [subject property] shall not be paid to Limited Partner Michael Groft, his estate, or heirs, until such time as Limited Partners Mark E. Woolley and Steven J. Gumenick, their respective heirs and/or assigns, have each received [value], from sale proceeds, refinance proceeds or payment from Michael Groft."

25.     In some instances, where the Demand Notes pertained to real estate purchased solely by Woolley, the language used was the following:

> "Any proceeds from refinancing or the sale of the [subject property] shall not be paid to Limited Partner Michael Groft, his estate, or heirs, until such time as Limited Partner, Mark E. Woolley, his respective heirs and/or assigns, has received [value], from sale proceeds, refinance proceeds or payment from Michael Groft."

26.     The Demand Notes also contained a confession of judgment provision whereby Groft "authorize[d] and empower[ed] any Attorney of the Court of record of Pennsylvania, or elsewhere, or the Prothonotary or Deputy of any Court, to appear for and to enter Judgment against him for the above sum, with or without defalcation with costs of suit, release of errors, without stay of execution, and with Five (5%) percent added for the collection fees…"

LEGAL\51165442\1

### III. Groft Violated the Demand Notes and Failed to Repay them When the Properties Were Refinanced

27.     In violation of the Demand Notes, Groft took proceeds from the sale and/or refinancing of the aforementioned properties *prior to* the Demand Notes being satisfied. To be more specific, Groft took these proceeds *without ever* satisfying the Demand Notes – they remain unpaid, even though Groft has retained millions of dollars in refinance proceeds on investments he never paid for.

28.     At the time of the first refinancing project, Groft saw an opportunity to claim that the respective Demand Note was satisfied.  He seized on that opportunity, using his position as CFO and President, and the trust Woolley placed in him in that fiduciary role, to fraudulently misrepresent to Woolley that the Demand Note was satisfied while secretly pocketing the refinancing proceeds for his personal benefit.

29.     In doing so, Groft took advantage of not only his professional position but the trust that Woolley had placed in him.

30.     And seeing that he was able to effectively conceal this from Woolley, he did it again and again with subsequent refinancing projects.

31.     This was intentionally concealed from MGM and from Woolley for years.

LEGAL\51165442\1

**IV.** **Groft Used his Fiduciary Position as President of MGM to Affirmatively and Fraudulently Conceal his Failure to Repay the Demand Notes for Years**

32.     As MGM's CFO and President, and particularly in light of his responsibility for MGM's "entire operation," Groft controlled and manipulated the financial records, documents and the flow of information to the shareholders, including Woolley.

33.     Groft used this position, and Woolley's confidence in him, to conceal that he had not properly directed refinancing proceeds to repay Woolley before pocketing proceeds for himself.

34.     Groft's first significant fraudulent statements occurred in connection with the initial refinancing of each of the subject properties.

35.     The initial refinancing for most of the properties subject to the Demand Notes occurred in 2010 or 2011.

36.     In connection with each refinancing, Groft affirmatively and fraudulently misrepresented to Woolley that Groft was repaying the Demand Notes from Groft's 5% share of the refinance proceeds.

37.     Groft represented this orally to Woolley in response to questions about refinance distributions.

LEGAL\51165442\1

38.     Groft also used his position as President of MGM, pursuant to which he managed or oversaw the closing of each refinancing, including all associated paperwork.

39.     As President of MGM, Groft had fiduciary duties to Woolley and occupied a position of trust that included an obligation to refrain from committing fraud.

40.     Nonetheless, Groft used that position to misrepresent to Woolley that Groft had repaid the notes in documents or written communications related to the closing of the refinance transactions and subsequent distribution of proceeds.

41.     Accordingly, as each property was refinanced in 2010 or 2011, Groft lied to Woolley, telling him in writing and orally that Groft was paying back his 5% purchase price at the closing of each refinance.

42.     When Woolley specifically asked Groft about the status of the Demand Notes, Groft falsely represented that the Demand Notes had been paid.

43.     Groft continued to perpetuate his fraud and affirmatively conceal his failure to repay the Demand Notes throughout his tenure as President of MGM, and beyond.

44.     Beginning in at least 2015, but possibly beginning earlier, Groft maintained spreadsheets and other documents on the MGM computer systems,

including documents related to the above-referenced refinancing transactions, that fraudulently stated the Demand Notes had been repaid.

45.    One specific such document was a spreadsheet Groft created in 2015 in response to an inquiry from Woolley.

46.    That year, Woolley asked Groft to confirm the repayment status of each of the Demand Notes.

47.    Groft responded to the inquiry with an excel spreadsheet titled "MJG Ownership Ledger-2015."

48.    In this document, Groft wrote "Above summary structured (per written Note Agreement on each property) stating that Groft does not receive any proceeds from refinance or sale transaction unless [Woolley] and [Gumenick] first receive an amount commensurate to the Note amount owed by Groft.  In all cases above where the Note has been cancelled, [Woolley] and/or [Gumenick] did receive funds in excess of the note from Groft."

49.    This representation was in fact false.  All but one Demand Note had been recorded as cancelled.  Woolley had not received any repayment funds from Groft, let alone funds sufficient to satisfy the Notes.

50.    Woolley relied on Groft's representations, the trust he had put in Groft, and their professional relationship.  He did not question Groft further.

Woolley trusted Groft that his obligations under the Demand Notes had been satisfied.

51.    Groft maintained this spreadsheet, and other documents, on the MGM systems during his tenure as President. Accordingly, the MGM corporate documents available to Woolley consistently reflected that the Demand Notes had been repaid because of Groft's fraudulent misrepresentations.

52.    Groft maintained these fraudulent documents on the MGM systems until he stepped down as President in 2017.

53.    Worse yet, the only Demand Note which was properly recorded as satisfied, which pertained to Cold Springs Apartment, was the product of Groft's express misrepresentations to Woolley.

54.    On April 6, 2017, Groft and Woolley executed an Affidavit reflecting that the Demand Note dated March 28, 2008, was "retired" on March 28, 2008, and "thus no debt exists." (*A true and correct copy of the April 6, 2017 Affidavit is attached hereto as Exhibit 3.*)

55.    Groft asked Woolley to execute the affidavit and represented to Woolley that the debt had in fact been paid.

56.    Relying on Groft's representation, Woolley agreed and executed the affidavit.

57. Notably, none of the other original Demand Notes had never been marked "Cancelled" or "Paid in Full."

58. As a professional banker, and as a borrower on the Demand Notes, it is unfathomable that if the Demand Notes had in fact been satisfied that Groft would not have marked them all as "Paid in Full" or "Cancelled" to formally evidence that he had satisfied his obligations to Woolley.

59. As a life-long banking professional, Groft is fully aware of this best practice which documents that a borrower's obligations to a lender have been satisfied.

60. In 2017, Groft stepped down as President of MGM.

61. In 2019, as the two business partners began to separate their affairs, Woolley again checked on the repayment status of the Demand Notes.

62. In response, Groft again sent a fraudulent spreadsheet – nearly identical to the one sent in 2015 and maintained on MGM's systems – that incorrectly stated Groft had repaid the notes years ago.

63. As a significant shareholder in MGM, Woolley had reasonably relied upon Groft's representations, as President, to be truthful in light of Groft's fiduciary duties, including his representation that the Demand Notes had been repaid in connection with the refinancing of the subject properties.

LEGAL\51165442\1

64.     However, throughout Groft's tenure, he abused that trust to avoid repaying the Demand Notes and conceal that fact from Woolley.

**V.     Woolley's Discovery of Groft's Deception and the Unpaid Status of the Demand Notes.**

65.     In early 2020, Woolley learned through MGM's attorneys and officers that Groft engaged in separate misconduct by breaching another contract with Woolley, referred to as the "KGLA Agreement" below.

66.     Upon learning of this misconduct, Woolley began to question Groft's previous statements about repaying the Demand Notes.

67.     Woolley investigated diligently, and by close examination of financial documents and MGM records, which Groft now had no control over since he was no longer President, discovered that the Demand Notes had not, in fact, been repaid.

68.     It was only through Woolley's diligent investigation in early 2020, which was triggered by learning of potential other misconduct by Groft, that Woolley was able to discover that Groft had never repaid the Demand Notes and had, instead, lied to Woolley and others for years.

69.     Furthermore, upon information and belief, Groft did not account for the proceeds from the properties on his income taxes.  Even if the proceeds were a gift to Groft, which they were not, Groft would have had to report the interest as income, and he would have had to inform Woolley and/or Gumenick that the

16

proceeds were treated as a gift so that they could report the transaction through gift tax returns.

70.     Furthermore, the proceeds were not reported on the tax documents the partnerships issued to Woolley and Gumenick.

71.     Not once did Groft, as MGM's President, ever discuss the proper tax treatment of the Demand Notes and related proceeds with Woolley.

72.     Groft not only failed to abide by the Demand Note's terms, but he fraudulently covered his steps and created false documentation to conceal his improper gains.

## VI.     Groft's Breach of the KGLA Agreement

73.     In addition to the Demand Notes, Groft has also failed to abide by his obligations under a separate agreement executed between him and Woolley on March 13, 2013, pertaining to one property—King's Grant.  (*A true and correct copy of the KGLA Agreement, dated March 13, 2013, is attached hereto as Exhibit 4.*)

74.     Pursuant to this Agreement, referred to as the KGLA Agreement, Woolley sold three (3%) percent of his interest in KGLA Associates to Groft in exchange for $262,200.00.  (KGLA Agreement, at § 2.)

75.     Consistent with the Demand Notes, the KGLA Agreement provided that "[a]ny proceeds from refinancing or the sale of KGLA assets shall not be paid

to Groft, his estate or heirs, until such time as Woolley, his respective heirs and/or assigns, has received [$262,200] from sale proceeds, refinance proceeds or payment from Groft."  (KGLA Agreement, at § 3.)

76.     Furthermore, and distinguishable from the Demand Notes, the KGLA Agreement provided that "[i]f at any time Groft shall no longer be employed by MGM by reason of voluntary termination, termination with just cause, or retirement without Woolley's prior approval, then Woolley shall have the option to repurchase his 3% limited partnership interest from Groft for *an amount equal to the Purchase Price*, exercisable on or after the date of termination for a period of one (1) year."  (KGLA Agreement, at § 4 (emphasis added).)

77.     In 2017, Groft voluntarily terminated his employment with MGM in favor of starting a new company, Property Management Enterprise ("PME").

78.     Given Groft's voluntary departure from MGM, Woolley has the option to repurchase the 3% interest in KGLA for the price Groft.

79.     Because as a result of his fraudulent conduct, Groft paid *nothing* for the interest in KGLA, Woolley demands that the 3% interest be returned to him at no-cost, which is equivalent to what Groft paid.

## VII.  Woolley's Presuit Demands that Groft Comply with His Obligations

80.     On or about August 27, 2020, through his counsel, Woolley formally demanded payment from Groft.  After realizing that the Demand Notes had never

18

been satisfied and that Groft had been collecting proceeds nonetheless, Woolley, through counsel, wrote a letter to Groft describing what Woolley had discovered and demanding payment on the Demand Notes. (*A true and correct copy of the August 27, 2020 Demand Letter is attached hereto as Exhibit 5*).

81.     In response, by letter dated September 23, 2020, Groft refused to make payment as owed to Woolley and refuted that he was ever under any obligation to make the payments.  A position which is entirely undercut by, among many other things, the execution of fourteen separate Demand Notes.

82.     Now, even after Woolley demanded payment, Groft continues to refuse that he has committed any wrongdoing and remains in breach of the Demand Notes.

**COUNT I**
**BREACH OF CONTRACT (Demand Notes)**

83.     Woolley incorporates and restates the allegations contained in the preceding paragraphs as set forth herein at length.

84.     The Demand Notes are valid and enforceable contracts for which due consideration was given.

85.     Groft breached the Demand Notes by taking proceeds from the sale and/or refinancing of the aforementioned properties *prior to* the Demand Notes being satisfied.

86.     As a direct and proximate result of Groft's breach of the Demand Notes, Woolley has incurred damages.

WHEREFORE, Plaintiff Mark E. Woolley demands that judgment be entered in his favor, and against Michael Groft, in an amount in excess of $75,000, and the relief set forth in the Demand for Relief below.

## COUNT II
## BREACH OF CONTRACT (KGLA Agreement)

87.     Woolley incorporates and restates the allegations contained in the preceding paragraphs as set forth herein at length

88.     The KGLA Agreement is a valid and enforceable contract for which due consideration was given.

89.     Woolley fulfilled his obligations under the KGLA Agreement by providing Groft with a  3% interest in KGLA. Woolley's performance is complete.

90.     Groft, however, breached the KGLA Agreement by failing to pay Woolley for the 3% interest provided to him, even after KGLA had been refinanced, and the refinance produced substantial proceeds. Instead, Groft pocketed the proceeds for himself and never paid Woolley.

91.     Groft's failure to pay for his interest is a complete and total breach of his obligations under the KGLA Agreement.

92.     Groft also committed a separate breach of the KGLA Agreement when he voluntarily terminated his employment at MGM, and failed to provide

20

Woolley the option to repurchase the 3% interest in KGLA Associates as required by the KGLA Agreement.

93.     As a direct and proximate result of Groft's breach of the KGLA Agreement, Woolley has incurred damages.

94.     Moreover, because Groft's conduct is a complete and total breach of his obligations under the KGLA Agreement, Woolley is entitled to rescind the KGLA Agreement and choose restitution as his remedy.

WHEREFORE, Plaintiff Mark E. Woolley demands that judgment be entered in his favor, and against Michael Groft, that the KGLA Agreement be rescinded, that the 3% interest provided to Groft in the KGLA Agreement be restored to Woolley, that the Court award appropriate monetary damages, and that Court enter the relief set forth in the Demand for Relief below.

## COUNT III
## FRAUD

95.     Woolley incorporates and restates the allegations contained in the preceding paragraphs as set forth herein at length.

96.     The fraud alleged here arises from more than a decade-long scheme that Groft carried out and intentionally concealed from Woolley, beginning at the time of the first refinancing project.

97. Groft repeatedly misrepresented to Woolley, both orally and through the creation of false documents, that the Demand Notes were satisfied when in fact they were not.

98. Groft manufactured these intentional misrepresentations to cover up his wrongful taking of proceeds, and for years, he was successful in doing so.

99. Woolley justifiably relied on not only Groft's false representations made orally, but Woolley also relied on Groft's recordkeeping and representations made within MGM's documents as to the status of each Demand Note.

100. As a proximate result of Groft's misrepresentations, Woolley has incurred damages.

WHEREFORE, Plaintiff Mark E. Woolley, demands that judgment be entered in his favor, and against Michael Groft, in an amount in excess of $75,000, and the relief set forth in the Demand for Relief below.

## COUNT IV
## UNJUST ENRICHMENT

101. Woolley incorporates and restates the allegations contained in the preceding paragraphs as set forth herein at length.

102. Per the parties' agreement and as expressed in the Demand Notes, Woolley relieved Groft of any obligation to pay for a share of the interest in fourteen properties at the time each was purchased. As a result, Groft was able to receive the benefits of ownership without incurring any initial cost or expense.

22

103.   Woolley, on the other hand, paid substantial amounts at the time of purchase for each property, amounts that were more significant than was reflected in his ownership share given that Groft was not contributing financially initially.

104.   Woolley permitted Groft to rely on future proceeds generated by Groft's share from refinancing efforts to then repay him for the ownership interest he provided to Groft.

105.   Woolley afforded this courtesy to Groft so that Groft could receive ownership interest without having to immediately pay from his own pockets.

106.   However, Groft never repaid his ownership interest and collected proceeds from the properties for years to follow.

107.   Groft wrongfully received and retained proceeds from sales and/or refinancing projects of various properties.

108.   As a result of these improper takings, Woolley was denied his rightful portion of the distributions.

109.   Groft has been unjustly enriched by taking proceeds that were rightfully meant for Woolley, and it would be inequitable to allow Groft to retain those proceeds, to Woolley's detriment.

WHEREFORE, Plaintiff Mark E. Woolley, demands that judgment be entered in his favor, and against Michael Groft, in an amount in excess of $75,000, and the relief set forth in the Demand for Relief below.

## COUNT V
## DECLARATORY RELIEF (Demand Notes)

110. Woolley incorporates and restates the allegations contained in the preceding paragraphs as set forth herein at length.

111. Where there is a question as to the proper interpretation of the Demand Notes, which is expressly denied, Groft was not entitled to receive his proceeds until *after* the Demand Notes had been satisfied.

112. Groft took proceeds from the sale and/or refinancing of the aforementioned properties *prior to* the Demand Notes being satisfied.

113. There is an actual, justifiable controversy as to the method by which Groft took the proceeds.

114. Pursuant to Pennsylvania's declaratory judgment statute, 42 Pa. Const. Stat. § 7532, Woolley is entitled to a judicial determination of his rights in connection with the Demand Notes.

WHEREFORE, Plaintiff Mark E. Woolley, demands that judgment be entered in his favor, and against Michael Groft, and the relief set forth in the Demand for Relief below.

## COUNT VI
## DECLARATORY RELIEF (KGLA Agreement)

115. Woolley incorporates and restates the allegations contained in the preceding paragraphs as set forth herein at length.

24

116. Where there is a question as to the proper interpretation of the KGLA Agreement, which is expressly denied, Groft was not entitled to receive his proceeds until *after* the related Demand Note had been satisfied, and Groft was required to provide Woolley with the option to repurchase the 3% interest in KGLA Associates for the price which Groft had paid.

117. Groft took proceeds from the sale and/or refinancing of the aforementioned properties *prior to* the Demand Note being satisfied.

118. Groft never paid for the 3% interest in KGLA Associates which Woolley agreed to give to him in exchange for $242,200 to be paid from proceeds from refinancing.

119. There is an actual, justifiable controversy as to Woolley's ability to exercise the option under the KGLA Agreement and obtain the 3% interest at no-cost and ability to demand the contract rescinded.

120. Pursuant to Pennsylvania's declaratory judgment statute, 42 Pa. Const. Stat. § 7532, Woolley is entitled to a judicial determination of his rights in connection with the KGLA Agreement.

WHEREFORE, Plaintiff Mark E. Woolley, demands that judgment be entered in his favor, and against Michael Groft, and the relief set forth in the Demand for Relief below.

## **DEMAND FOR RELIEF**

25

WHEREFORE, Plaintiff Mark E. Woolley requests that the Court enter judgment in his favor on all Counts as follows:

a) Damages in an amount in excess of $75,000;

b) Damages in an amount in excess of $75,000 for Woolley's breach of the Demand Notes;

c) Rescission of the KGLA Agreement;

d) Return of Groft's 3% interest in KGLA Associates to Woolley at no cost to Woolley;

e) Punitive damages in an amount to be determined;

f) Attorneys' fees, costs, and expenses in an amount to be determined;

g) Pre and post-judgment interest in amounts to be determined; and

h) Such and further relief as the Court deems appropriate

COZEN O'CONNOR

Dated: October 13, 2020

By: *Arthur P. Fritzinger*
Arthur P. Fritzinger (309533)
17 North 2nd Street, Suite 1410
Harrisburg, PA 17101
(717) 703-5900
(717) 703-5901 (fax)
afritzinger@cozen.com
*Attorney for Plaintiff Mark E.*

LEGAL\51165442\1

*Woolley*